In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-1847

GRINNELL MUTUAL REINSURANCE CO.,

*Plaintiff-Appellee,*

*v.*

S.B.C. FLOOD WASTE SOLUTIONS, INC. F/K/A FLOOD WASTE
SOLUTIONS, INC., BRIAN J. FLOOD, SHAWN FLOOD, CHRISTOPHER
FLOOD, AND KAREN S. COLEY,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-04922 — **Harry D. Leinenweber**, *Judge.*

———————————

ARGUED APRIL 4, 2024 — DECIDED AUGUST 21, 2024

———————————

Before EASTERBROOK, HAMILTON, and KOLAR, *Circuit
Judges.*

KOLAR, *Circuit Judge.* This insurance litigation arises be-
cause of a family business dispute over use of the name
"Flood" in connection with the waste collection and hauling
business in the Chicago area. While the underlying family dis-
pute is rather heated and convoluted, resolution of this case

comes down to a straightforward application of Illinois insurance law. Shortly after a series of tense meetings and exchanging letters between lawyers, Defendant-Appellant S.B.C. Flood Waste Solutions, Inc. obtained insurance from Plaintiff-Appellee Grinnell Mutual Reinsurance Co., without disclosing the family dispute. SBC Flood and other individuals were soon sued and sought to have Grinnell cover the costs of the legal defense. Grinnell refused and instead filed this lawsuit seeking rescission of the insurance policies.

The district court granted summary judgment in favor of Grinnell, finding it was entitled to rescind the insurance policies based on material misrepresentations. SBC Flood and the individual defendants appeal. We affirm.

## I.    Background

Until the end of 2017, Brian Flood and his two sons, Chris Flood and Shawn Flood, worked in sales at Flood Brothers Waste Disposal Company (which is not a party to this appeal). Flood Brothers is a waste collection and hauling business founded by Brian's father (and Chris's and Shawn's grandfather) Mike Flood. In addition to working in sales at Flood Brothers, Chris also owned and operated a side business known as "Flood, Inc." beginning in 2014. Flood, Inc. provided similar waste collection and hauling services, ostensibly for clients that Flood Brothers could not or did not want to service.

While the entire history of what happened is not necessary to resolve this appeal, suffice it to say that by October 2017, trouble began brewing. After a tense meeting on October 5, Brian, Shawn, and Chris were all pushed out of the family business Flood Brothers and were told that Chris needed to

stop "using the Flood name" in connection with his side business, Flood, Inc.

Matters escalated when Flood Brothers' attorney sent Brian and Chris a letter demanding they "cease and desist any commercial use of 'Flood, Inc.'" because "[u]se of the name 'Flood, Inc.' interferes with the protected proprietary name of 'Flood Bros Disposal Co. & Recycling.'" Chris tried to smooth things over with his grandfather, but he was unmoved and told Chris, "[y]ou are using my name and … stealing from me." As for Shawn, when he was fired from Flood Brothers, he was told it was because he was "the contact for another firm, which interferes in proprietary rights of Flood Brothers account obligations."

Within 24 hours of his sons' respective firings for using the Flood name in connection with another waste collection and hauling company, Brian's fiancée Karen Coley filed incorporation papers with the State of Illinois for a new entity named "Flood Waste Solutions, Inc." Brian, Chris, and Shawn all became owners or employees of this new company.

The recently fired Floods also began to lawyer up. Chris's attorney responded to Flood Brothers' cease-and-desist letter "for settlement purposes," contesting Flood Brothers' assertions that Flood, Inc. interfered with any of Flood Brothers' rights and claiming that Chris was owed money by his former employer. The letter further told Flood Brothers that it had "a legal obligation" to maintain documents and evidence "which may be relevant to the subject matter of, or discoverable in any potential action arising from this matter." Brian met with his lawyer about the name and logo of "Flood Waste Solutions, Inc." His lawyer advised him to add "SBC" to the company's name (presumably for Shawn, Brian, and Chris) and to ensure

those letters were emphasized compared to the word Flood. Brian was told to make sure that the name Flood didn't "jump" out. Brian testified that he consulted with lawyers because he "didn't want to get sued" and "wanted to make sure that everything we did was legal." On January 15, 2018, less than two weeks after the email with counsel, Flood Waste Solutions, Inc. filed paperwork to change its name to S.B.C. Flood Waste Solutions, Inc.

With all these events barely in the rearview mirror, SBC Flood applied for insurance on February 9, 2018. SBC Flood submitted a series of applications through a broker with information regarding its past, present, and planned operations. When the Commercial General Liability and Commercial Auto applications asked for SBC Flood's loss history, including "all claims or losses (regardless of fault and whether or not insured) or occurrences that may give rise to claims," SBC Flood checked a box indicating "None" on both applications. The applications did not contain any mention of the dispute with Flood Brothers or the attempts to settle the dispute. When the same applications asked whether any of the SBC Flood principals had "other business ventures for which coverage is not requested," SBC Flood indicated "No" on the application, giving no indication as to the existence of Chris's company Flood, Inc., which was providing garbage-related services (through subcontractors and without insurance) throughout this time. With no loss history, potential claims or occurrences, or other business ventures referenced in the application, Grinnell approved and issued a Commercial

General Liability and Commercial Auto policy to SBC Flood effective February 12, 2018.[1]

Less than three months after SBC Flood obtained insurance from Grinnell, the Flood family dispute intensified, and the threatened litigation came to fruition. Flood Brothers sued SBC Flood and the individual defendants on May 10, 2018, in Illinois state court alleging improper and unfair use of the "Flood" name in connection with waste collection and hauling services in the Chicagoland area. *See Flood Bros Disposal Co. v. S.B.C. Flood Waste Solutions, Inc., et al.*, No. 2018 CH 000608.

SBC Flood tendered the lawsuit to Grinnell and sought coverage to pay for its legal defense. Grinnell in turn filed this lawsuit seeking a declaration that it had no duty to defend and to rescind the insurance policies. At the conclusion of discovery, and after the district court ruled the state court lawsuit was within the scope of the policy (assuming it was valid), Grinnell moved for summary judgment on its policy rescission claim on the grounds that SBC Flood had made materially false statements in its insurance applications.

The district court granted Grinnell's motion for summary judgment, finding that the undisputed evidence demonstrated three categories of false statements in SBC Flood's insurance applications. First, not disclosing any "claims or losses or occurrences that may give rise to losses." Second, failing to disclose the existence of Flood, Inc. as an "other

---

[1] On June 13, 2018, SBC Flood also submitted a subsequent application for umbrella liability insurance that likewise omitted any reference to Flood, Inc. or a potential dispute with Flood Brothers, which by then had become a pending lawsuit.

business venture." Third, the district court found that while SBC Flood "verified throughout both the CGL and Auto Applications that SBC [Flood] had not begun any business activity prior to March 1, 2018," this was false because the district court determined SBC Flood in fact operated for months prior by using Flood, Inc. as an alter ego.

The district court further found SBC Flood's false statements material. The judge relied upon an undisputed declaration from Karen Faas, a senior underwriter at Grinnell who was responsible for the decision to bind and issue the insurance policies for SBC Flood. She outlined how Grinnell considers businesses in the 'garbage, ash or refuse collecting' industry to be a higher risk than most other businesses. She explained how Grinnell relies on disclosure of any claims history or occurrences that may give rise to claims in evaluating an application because companies with prior or pending claims often represent an increased risk for insurance companies. The underwriter further testified that had SBC Flood disclosed the conversations with Flood Brothers founder Mike Flood where he accused his son and grandsons of unfair competition or the cease-and-desist letter from Flood Brothers at the time of the application, she would have rejected the applications.

Grinnell's underwriter did not say that the failure to disclose Flood, Inc. would have definitively led her to reject the application. However, she did indicate she would have requested additional information, including details about the company's operations and insurance coverage (which Flood, Inc. did not have) prior to issuing the policies.

## II.    Analysis

We review a grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in the non-moving party's favor. *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018). Stated differently, we do not defer to the district court's factual findings or legal conclusions; we instead review on "a clean slate." *Xiong v. Bd. of Regents of Univ. of Wis. Sys.*, 62 F.4th 350, 353 (7th Cir. 2023). We are likewise not cabined by how the district court decided the case and may affirm summary judgment "on any ground supported in the record, so long as that ground was adequately addressed in the district court and the nonmoving party had an opportunity to contest the issue." *W. Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d 219, 222 (7th Cir. 2017).

The parties agree that Illinois law governs this dispute. Section 154 of the Illinois Insurance Code, 215 ILCS § 5/154, "allows insurers to deny coverage and rescind a policy if (1) a statement in the policy application is false and (2) the false statement either was made with the intent to deceive the insurer or materially affects the acceptance of the risk assumed by the insurer." *Essex Ins. Co. v. Galilee Med. Ctr. S.C.*, 815 F.3d 319, 322 (7th Cir. 2016) (quoting *Ill. State Bar Ass'n Mut. Ins. Co. v. Law Office of Tuzzolino & Terpinas*, 2015 IL 117096 ¶ 17. The second element is disjunctive: a policy may be rescinded for a false statement that was either (1) "made with intent to deceive" or (2) "materially affects the acceptance of risk assumed." *Id.; see also Ill. State Bar Ass'n*, 2015 IL 117096 ¶ 17. "If the misrepresentation materially affects the insurer's acceptance of the risk, it does not matter that one of the parties, or an insured, might not have been to blame for the

misrepresentation." *Ill. State Bar Ass'n*, 2015 IL 117096 ¶ 17. In other words, "under § 154, 'a misrepresentation, even if innocently made, can serve as the basis to void a policy'" so long as it is material. *Essex Ins.*, 815 F.3d at 323 (quoting *Golden Rule Ins. Co. v. Schwartz,* 203 Ill.2d 456, 464 (2003)).

To determine materiality, Illinois law has long used an objective test that asks whether a "reasonably careful and intelligent" underwriter "would have regarded the facts as stated as substantially increasing the chances of the event insured against, so as to cause a rejection of the application or different conditions.'" *Weinstein v. Metro. Life Ins. Co.*, 389 Ill. 571, 577 (1945). "Testimony from an insurer's underwriter may be used to establish the materiality of omitted information." *Essex Ins.*, 815 F.3d at 324 (citing *Small v. Prudential Life Ins. Co.*, 246 Ill. App. 3d 893, 897 (1993)). An insurer need not "show that truthful statements by the insured would have caused the insurer to reject the application entirely." *Id.* Instead, a misrepresentation is material if it "'affects either the acceptance of the risk or the hazard assumed' by the insurer." *Id.* (quoting 215 ILCS § 5/154). "Incomplete answers or a failure to disclose material information in response to a question in an application may thus constitute a material misrepresentation." *N. Life Ins. Co. v. Ippolito Real Est. P'ship*, 234 Ill. App. 3d 792, 801 (1992).

It is undisputed that SBC Flood omitted the dispute over use of the Flood name from its applications. SBC Flood was acutely aware of a live dispute based on the events that transpired in the prior three months. This includes the October 5 meeting where Brian learned that his son Chris and Flood, Inc. stood accused of improper competition by using the Flood name, the cease-and-desist letter addressed to Brian

and Chris, Shawn's termination letter, and conversations between Chris and Mike Flood about whether use of the Flood last name was "stealing." It also includes Chris's counsel's response letter weeks later "for settlement purposes" and advising Flood Brothers of its obligations to preserve evidence relating to "any potential action arising from this matter."[2] Finally, Brian sought advice from counsel around this same time regarding the name and logo of SBC Flood because he had concerns that he or SBC Flood might be sued and he "wanted to make sure that everything we did was legal."

In short, undisputed facts show that the dispute that led to litigation was clearly on the Flood family's mind at the time they applied for insurance. SBC Flood's failures to disclose any aspect of these events as potential claims against them or their company—in insurance parlance, "occurrences which may give rise to claims"—were misrepresentations, whether intentional or not. *Golden Rule Ins.*, 203 Ill.2d at 464 ("a misrepresentation, even if innocently made, can serve as the basis to void a policy").

The second category of false statements is the failure to disclose the existence of "Flood, Inc." when the insurance applications asked whether SBC Flood had any "other business ventures" for which coverage was *not* being sought. While SBC Flood maintains there was no need to disclose Flood, Inc. because it was a wholly separate company and therefore not related to SBC Flood, there was no such qualification in the

---

[2] While the substance of this letter might be inadmissible under Fed. R. Evid. 408 for purposes of establishing liability in the underlying matters as an offer of compromise, it aptly demonstrates how Chris was aware of the potential for litigation between him and Flood Brothers no later than December 2017.

application. Insurance applications are construed in accordance with the plain meaning and from the standpoint of an ordinary and reasonable person. *Gillen v. State Farm Mut. Auto. Ins. Co.*, 215 Ill.2d 381, 393 (2005). The application asked for "other business ventures," and none were disclosed. That was a misrepresentation.

Because SBC Flood made misrepresentations in its insurance application, our inquiry moves on to whether those misrepresentations were material. 215 ILCS § 5/154; *Essex Ins.*, 815 F.3d at 324. Here, we have no difficulty determining that the misrepresentations were material based on the undisputed testimony of Grinnell's underwriter and our precedent.

In contesting materiality, SBC Flood and the individual defendants rely heavily on speculation and their own inferences regarding the subjective state of mind of various Grinnell employees who were deposed throughout the litigation. But as discussed above, Illinois law uses an objective test to determine materiality in the context of insurance policy rescission. *Weinstein*, 39 Ill. at 577; *see* 215 ILCS § 5/154; *Essex Ins.*, 815 F.3d at 324. And rescission is proper when a misstatement is material *or* intentional as viewed through this objective lens. *Weinstein*, 39 Ill. at 577. Objectively, failing to disclose a dispute that already had led to the parties exchanging letters threatening litigation is material.

SBC Flood further argues that to the extent there was any dispute or occurrence that may give rise to a claim from use of a name, Flood Brothers only took issue with the specific name "Flood, Inc." and not with use of the shared last name Flood generally. This argument is not supported by the record or common sense.

It is simply inaccurate to frame the ongoing dispute as only covering the specific name "Flood, Inc.," as opposed to general use of the Flood name in connection with Chicago-area waste collection and hauling. Any notion that SBC Flood or the individual defendants understood Flood Brothers' concern in such a way is contradicted by Brian and Chris's sworn testimony and actions. After the initial October 2017 meeting, Brian immediately told his sons to change "Flood, Inc." to something "other than Flood." In December, Chris's grandfather and the founder of Flood Brothers told him "you are using my name and … stealing from me." The family name is Flood and there was no mention of "Inc."

This is also not the first insurance rescission case where an insured failed to disclose brewing litigation in their insurance applications. For example, in *TIG Ins. Co. v. Reliable Research Co.*, 334 F.3d 630, 632 (7th Cir. 2003), a title insurance and escrow issuing agent failed to disclose a permanent injunction barring it from unauthorized practice of law in its insurance application. When the title company was later sued for violating the injunction and sought to have its insurer cover the costs of its defense, the insurer sought rescission. *Id.* at 632–633. We affirmed the district court's grant of summary judgment in favor of the insurer and said "it borders on surreal to think that the nondisclosure [of the injunction] was immaterial." *Id.* at 637.

Likewise, in *Essex Ins. Co. v. Galilee Medical Ctr. S.C.*, 815 F.3d 319 (7th Cir. 2016), a weight loss medical service provider answered "no" when an insurance application asked if it "use[d] drugs for weight reduction for patients" or if it performed "experimental procedures." *Id.* at 320. Yet at the same time and thereafter, the company and its physicians regularly

administered experimental weight loss treatments and drugs. *Id.* When a patient sued for medical negligence after she suffered adverse side effects, the medical provider tendered the lawsuit to its insurer for defense, and the insurer sought rescission. *Id.* at 321. Once again, we affirmed the district court's grant of summary judgment under the circumstances and repeated that it "borders on the surreal" to think nondisclosure of the very experimental drug procedure the medical provider was sued for was somehow immaterial to the insurer's acceptance of risk. *Id.* at 324.

Here, Flood Brothers' unambiguous demand to cease and desist use of the Flood name in the Chicago-area waste collection and hauling business led directly to the lawsuit that SBC Flood sought to have its insurer defend. There is, thus, an even greater connection between the non-disclosure and the risk that materialized than there was in *TIG* or *Essex*. Arguing that an ongoing dispute with a former employer concerning use of its company name, in the same industry, in the same geographic area, and that results in a lawsuit alleging exactly this less than three months after an insurance policy "borders on the surreal." *TIG Ins.*, 334 F.3d at 637; *Essex Ins.* 815 F.3d at 324.

Concerning the materiality of failing to disclose the existence of Flood, Inc., we are similarly unpersuaded by SBC Flood's arguments. While one could imagine instances where a party's other business ventures may not be material to an insurer's risk, we need not engage in speculation because the companies were so similar. Here, the other business venture in question, Flood, Inc., was operating in the same industry, in the same geographic area, for at least three years at the time of the applications. What's more, Flood, Inc. operated without

ever being insured. This is information that an insurance underwriter would reasonably expect to know before issuing an insurance policy and not something that any reasonable person would think could be omitted from an insurance application for a new company intending to operate in the same industry and in the same geographic area.

Lastly, we briefly mention the district court's conclusion that from December 2017 to February 2018, SBC Flood and Flood, Inc. operated as alter egos and should have their corporate separateness disregarded. *See Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569–70 (7th Cir. 1985) ("Under Illinois law, a corporation … will be disregarded and the veil of limited liability pierced when two requirements are met: [F]irst, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist; and second, circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.") (brackets in original).

Throughout its briefing and at oral argument, SBC Flood argues that the district court's decision cannot be affirmed unless we affirm the district court's finding that SBC Flood and Flood, Inc. operated as alter egos. SBC Flood is incorrect. As laid out above, there were multiple material misrepresentations in SBC Flood's insurance applications—and that remains so without wading into any alter ego analysis, which is "a highly fact-intensive inquiry." *Cont'l Cas. Co. v. Symons*, 817 F.3d 979, 993 (7th Cir. 2016); *see also Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 525 (7th Cir. 1991) (discussing the potential evidentiary difficulties in finding companies are alter egos of one another at summary judgment). Finding that SBC

Flood's failure to disclose the existence of Flood, Inc. or the very real prospect of litigation with Flood Brothers once SBC Flood started operating in the same industry, does not require any alter ego finding. We need not go further.

## III.    Conclusion

The judgment of the district court is AFFIRMED.